

**SIGNED this 7th day of June, 2016**

_Marcia P. Parsons_
_____
**Marcia Phillips Parsons**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

In re

    JASON LEE WILSON and             No. 15-51532 MPP
    AMBER DANNIELLE SHELTON WILSON

               Debtors.

## M E M O R A N D U M

      This chapter 7 case is before the court on the motion of debtors Jason and Amber Wilson for a finding of contempt and an award of damages against their former landlord Johnny Steadman. The Wilsons allege that Mr. Steadman willfully violated the automatic stay after their bankruptcy filing by repeatedly entering their home without permission and then evicting them on the day of their son's 16th birthday party, even though they were not in default under the lease. A hearing on the contempt motion was held on April 26, 2016. Testifying were the Wilsons, Mr. Steadman, his agent Robin Smith of Keller Williams Realty, two constables, and the Wilsons' attorney, Dave Jordan. As discussed below, the court will grant the Wilsons' motion and award them compensatory damages of $8,014.59, recovery of attorney fees and costs of $5,833.27, and punitive damages of $5,000 against Mr. Steadman. The following constitute findings of fact and conclusions of law

pursuant to Fed. R. Bankr. P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2)(O). *See, e.g., In re Depew*, 51 B.R. 1010, 1014 (Bankr. E.D. Tenn. 1985).

I.

On October 7, 2015, the Wilsons filed a voluntary petition for bankruptcy relief under chapter 7. At the time of their bankruptcy filing, the Wilsons resided along with their two minor sons in a house located at 313 Colonial Heights Road in Kingsport, Tennessee that they rented from Mr. Steadman. The written lease agreement between Mr. Steadman as landlord and Mrs. Wilson and Toni New, Mrs. Wilson's mother, as tenants, provided for monthly rent of $650 and had a one-year term beginning March 3, 2015, and ending March 3, 2016. According to the agreement, the lease was a transfer of an original lease dated November 15, 2014, from Mr. Wilson to Mrs. Wilson and her mother Toni New, with the security deposit previously paid by Mr. Wilson applied to the transferred lease. Mr. Wilson testified that the transfer occurred at the time he and his wife were going through some marital difficulties, that they had since worked through. Attached to the lease is a document entitled Confirmation of Agency Status, stating that Robin Smith of Keller Williams Realty is the designated agent for Mr. Steadman in connection with the leased real property. Both Ms. Smith and Mr. Steadman testified that Keller Williams managed the property for him.

The Wilsons did not schedule Mr. Steadman as a creditor, and there was no evidence that they were delinquent in their rent payments or otherwise in default of the lease at the time of their bankruptcy filing. The lack of default is further confirmed by the detainer summons that Mr. Steadman caused to be issued against the Wilsons after their bankruptcy filing, stating "the amount of rent now owing and unpaid is $ _0_ " and providing no reason in the blank requiring the basis for which "the right of possession has now terminated." While the detainer summons does have a box checked, indicating that "Written . . . notice to vacate was given to Defendant(s) on or about September 16, 2015," no witness was questioned about this statement, and there was otherwise no evidence or suggestion that a lease termination letter had been sent.

Mr. Steadman testified that the Wilsons had informed Keller Williams that they would be out of the house by October 30, which was on a Sunday, and that he went by the house the Friday before and asked Mr. Wilson if they needed help moving, and that Mr. Wilson informed him that

2

they did not, that they would be ready.  Mr. Wilson denied that Keller Williams was ever told that they would be moving.  He further testified that he told Mr. Steadman when he came by that they had no plans to move until their lease was up in March 2016, that their rent was current, that they had filed for bankruptcy relief, and that Mr. Steadman should contact the Wilsons' attorney Dave Jordan.

Mrs. Wilson testified that a few days later, on November 2, 2015, Mr. Steadman came to her home and entered it without permission, causing an argument to ensue between the two of them. She testified that she told him that he needed to talk with her attorney since they had filed bankruptcy.  Upset by the unauthorized intrusion, Mrs. Wilson contacted the police and filed a police report against Mr. Steadman for criminal trespass.  She also telephoned her husband, who was working out of town at the time as a construction superintendent in Mississippi, but returned home because of the disturbance.  Mr. Steadman did not deny Mrs. Wilson's account of the November 2 incident, although he did deny that he had entered the home without permission, stating that Mrs. Wilson had told him previously that he could enter at any time.  That same day, Mr. Steadman had the electrical and water utilities for the house taken out of Mr. Wilson's name and placed in the name of Mr. Steadman's daughter, who along with her husband moved into the rental property after Mr. Steadman had the Wilsons removed.

Robin Smith testified that Mr. Steadman informed her in November 2015 that he wanted the Wilsons removed from the premises.  She stated that she told Mr. Steadman she wanted to discuss the matter with an attorney before commencing eviction proceedings, because the Wilsons were current on their rent and it was unusual to evict a tenant when the rent was current.   Ms. Smith testified that she attempted to talk with Keller Williams' attorney about the matter, but when she was unable to get in touch with him, at Mr. Steadman's direction she filed a detainer action against Mrs. Wilson on November 11, 2015, with a hearing scheduled before the General Sessions Court of Sullivan County, Tennessee for November 30, 2015.

Constable Henry Price testified that he went to the Wilsons' residence several times in an

attempt to serve the detainer summons and was finally able to serve it on November 23, 2015.[1] He stated that when he arrived at the Wilsons' home that day, Mr. Steadman was already there and opened the back door for him, allowing the constable to stick his head in the door and yell in the house. Mrs. Wilson responded that she was in the bathroom taking a bath, and the constable posted the detainer summons on the door.

Mrs. Wilson testified that Mr. Steadman kicked in her locked basement door that day, and then entered the house while she was in the bathroom and commenced banging on the bathroom door, yelling and cursing. Mrs. Wilson testified that she told him to get out of her home, that he was not supposed to be contacting her anymore because of her bankruptcy filing, and that he was supposed to talk with her attorney. According to Mrs. Wilson, Mr. Steadman responded by repeatedly asking her to come out of the bathroom, calling her a profane name and stating that her lawyer no longer represented her, that she didn't have a bankruptcy lawyer anymore. At the hearing, Mr. Steadman was asked whether he had broken in as testified by Mrs. Wilson, and he invoked his Fifth Amendment right against self-incrimination in response. Constable Price testified that he did not witness and had no knowledge of anyone breaking into the Wilsons' residence.

After Mr. Steadman left the premises, Mrs. Wilson contacted the police, providing pictures of the broken lock. According to testimony, Mr. Steadman's actions in kicking in the back door caused a mirror to fall, damaging Mrs. Wilson's jewelry box, and that while he was in the house, Mr. Steadman took Mrs. Wilson's set of keys, including her house key and the keyless entry fob for her automobile. Besides contacting the police, Mrs. Wilson also notified her attorney Dave Jordan, who in turn sent a letter via fax and U.S. mail on November 25, 2015, to Tommy Kerns, Clerk of the Sullivan County General Sessions Court, with a copy by mail to Mr. Steadman, advising of the Wilsons' bankruptcy filing and enclosing for filing a Notice of Bankruptcy that included a copy of the Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors & Deadlines issued by the bankruptcy court clerk on October 8, 2015. The letter advised that "[t]he automatic stay provisions

---

[1] There was some dispute about the date that the detainer summons was served. While Constable Price testified that he served it on November 23, Mrs. Wilson testified that Constable Price served the summons on November 20. Because both dates occurred after the Wilsons' bankruptcy filing, it is unnecessary for the court to resolve the dispute.

of 11 U.S.C. § 362(a)(1) stay all judicial proceedings pending against the Debtor."  Similarly, the Bankruptcy Notice stated that "[i]n most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. . . . If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be penalized.  Consult a lawyer to determine your rights in this case."

On November 30, 2015,  the Wilsons and Mr. Jordan appeared in general sessions court for the scheduled hearing on the detainer action.  Not seeing the case listed on that day's docket, Mr. Jordan questioned the court clerk who informed him that the case had been removed because of the bankruptcy filing.  Satisfied that the matter had been stayed by the bankruptcy, the Wilsons and Mr. Jordan left.  However, Mr. Steadman appeared later and advised the judge that his case should be on the docket.  Apparently unaware of the bankruptcy filing, the judge called the case and, when neither Mrs. Wilson nor Mr. Jordan appeared, issued a default judgment of possession.  Mr. Wilson testified that Mr. Steadman came by the rental property later that day, and that they notified Mr. Jordan of the visit.

The next day, Mr. Jordan, having been advised by his clients that Mr. Steadman had visited them again, but unaware of what had transpired in court after he left, sent a second letter, this time addressed directly to Mr. Steadman.  In this letter, Mr. Jordan observed that Mr. Steadman had continued to contact Mrs. Wilson regarding her lease despite her bankruptcy filing and advised Mr. Steadman that "you must immediately terminate all of your collection activities and contact with our client, or we will be forced to file a Motion for Contempt in the Bankruptcy Court."

Robin Smith testified that on the evening of that same day, she received a phone call from Mr. Steadman's wife, who informed her that they had received notice of the Wilsons' bankruptcy filing in the mail, apparently Mr. Jordan's earlier November 25 letter.  Ms. Smith stated that upon hearing this news, she advised Mrs. Steadman that Mr. Steadman needed to talk with an attorney.  Ms. Smith stated that Mr. Steadman subsequently telephoned her on December 8, after he had received another notice of the bankruptcy filing, presumably Mr. Jordan's second letter.  Ms. Smith testified that she advised Mr. Steadman to talk with an attorney to determine how to proceed, as she had no experience with bankruptcy cases.  Ms. Smith testified that she confirmed the dates of these

5

two phone conversations, both the December 1 call with Mrs. Steadman and the December 8 call with Mr. Steadman, from her phone records.

Mr. Steadman testified that his wife informed him one evening around 6:00 or 7:00 p.m. that notice of the Wilsons' bankruptcy filing had come in the mail. Mr. Steadman did not recall the date, stating that he doesn't check the mail and that his wife only checks the mail every two or three weeks, but that he believed that the date was after the writ of possession had been served. Mr. Steadman did not dispute talking with Ms. Smith about the Wilsons' bankruptcy filing, but denied that she told him to consult an attorney, and said that Ms. Smith "lied" in this regard. According to Mr. Steadman, he called Keller Williams upon receiving the mailed bankruptcy notice and they indicated that "they were fine with it" and even said subsequently that their attorney was "fine with it."

On Friday, December 11, 2015, at approximately 4:30 p.m., Constable Woods went to the Wilsons' home to evict them based upon a writ of possession issued that same day. He testified that Mr. Steadman was there when he arrived, and when he knocked Mrs. Wilson came to the door, appearing scared and shaken up. The constable explained why he was there, and Mrs. Wilson advised him of her pending bankruptcy case. He testified that he told her in turn that he had to comply with the state court's order, which required him to give possession of the property to Mr. Steadman, although the constable did give Mrs. Wilson time to telephone her attorney Mr. Jordan to apprise him of the situation. Mr. Jordan attempted to call the state court judge to stop the eviction but was unable to make contact. Mr. Wilson arrived during this time and at Mr. Jordan's direction showed the notice of bankruptcy filing to Mr. Steadman and the constable, who nonetheless moved forward with the eviction. Mr. Wilson made arrangements for movers to come and load their furniture and other belongings into a small U-Haul truck, although due to its limited size there was not room to load a desk and weight bench and consequently these items were left at the house. The Wilsons also left behind a fish tank with a beta fish, as they did not anticipate that they would have room for it in a motel. The Wilsons had to discard food in the refrigerator and make alternative plans at a restaurant for their older son's 16th birthday party, as a party with guests had been planned that evening at their home. Constable Woods and Mr. Steadman waited while the Wilsons' personal property was loaded, and then changed the locks after the Wilsons left.

6

That night, the Wilsons and their sons stayed in a Motel 6, keeping their furniture in the rental truck while they tried to get back in their home or find alternative housing. Unable after a week to arrange either, they placed their furniture in storage, and continued to stay in the motel while looking for a new place to rent, which proved difficult because of their pending bankruptcy case. The Wilsons were finally able to locate and move into new rental lodgings on January 29, 2016.

On December 15, 2015, Mr. Jordan filed in the detainer action a Motion to Set Default Writ of Possession Aside and for Damages, describing the circumstances that had led to entry of judgment against the Wilsons and stating that the Wilsons were current on their rent and had never been in default under the lease agreement. On February 10, 2016, the parties, with Mr. Steadman now represented by an attorney, entered into an agreed order granting the Wilsons' motion to set aside.

On January 28, 2016, the Wilsons filed the motion for contempt and for damages against Mr. Steadman and Greater Kingsport Realty f/k/a Keller Williams Tri-Cities II that is presently before the court, seeking compensatory damages of $10,000, reasonable attorney fees, and punitive damages of $40,000. Neither Mr. Steadman nor Keller Williams filed a written response to the contempt motion. The hearing on the motion was set for March 1, 2016, but was continued until April 26, 2016, at the request of the parties. At the beginning of the hearing, attorney Dan Bieger made an appearance on behalf of the Wilsons, because Mr. Jordan would be called as a witness in the case. At that time counsel for the Wilsons also announced that the Wilsons had chosen not to pursue their motion against Keller Williams, that they would be proceeding only against Mr. Steadman.

Mr. Steadman's position as asserted by his attorney was that the Wilsons could not establish that Mr. Steadman acted with notice of the Wilsons' bankruptcy case since Mr. Steadman was not listed as a creditor, and because Mr. Jordan did not send his letters to Mr. Steadman by registered or certified mail. Mr. Steadman's counsel further contended that Mr. Steadman acted in good faith, as demonstrated by his entering into an agreed order to set aside the state court default judgment against the Wilsons once he obtained the advice of counsel, and that prior to then he had acted upon the advice of Keller Williams, who had not indicated that the Wilsons' bankruptcy filing presented

7

an impediment to moving forward with the eviction proceeding.  As to the damages sought by the Wilsons, Mr. Steadman's counsel questioned whether the Wilsons had mitigated their losses and argued that any award should be offset by the approximately $3,000 in damages to the rental house that Mr. Steadman claimed the Wilsons had caused.

At the conclusion of the hearing, counsel for the Wilsons renewed their request for both compensatory and punitive damages, based upon their presentation of damages totaling $12,364.59 as follows:

- $1,871.92 for the cost of staying 38 nights at the Motel 6 from December 11, 2015 through January 28, 2016;

- $750, consisting of $30 per day for the 25 days the debtors had to eat out while staying at the motel;

- $500 to Affordable Movers, consisting of $250 to load the truck on December 11 and $250 subsequently to load the furniture into storage;

- $537.67 for rental of the U-Haul truck from December 11 through 17;

- $275 for replacement of the keys taken by Mr. Steadman, including $100 for the keyless automobile entry fob;

- $320 in fuel for two round trips by Mr. Wilson from his job in Southhaven, Mississippi to Kingsport, Tennessee;

- $5,992 for Mr. Wilson's lost wages for 14 days at $428 per day when Mr. Wilson was called away from his job on three occasions: November 2 when Mr. Steadman entered the debtors' home and argued with Mrs. Wilson, November 30 for the hearing on the detainer summons, and December 11 when the debtors were evicted;

- $200 for a destroyed jewelry box;

- $375 for the desk, $400 for the weight bench, and $75 for the beta fish with tank the debtors had to leave behind at the rental house;

- $650 for their security deposit that Mr. Steadman did not return;

- $300 and $90, respectively, for electrical and water utility deposits the debtors lost when the utilities were taken out of Mr. Wilson's name; and

- $75 for the Christmas tree that the debtors were unable to use because they had to stay in the motel during the holidays.

Regarding the Wilsons' request for an award of their attorneys' fees and costs, the court directed that affidavits of fees and expenses be filed by their counsel, with Mr. Steadman's counsel being

8

provided an opportunity to object to the reasonableness of the requests.  The filed affidavits setting forth the fees and costs incurred by the Wilsons in connection with the stay violations and prosecution of the present motion total $5,833.27.  No objection to the reasonableness of the fees was filed by Mr. Steadman.

II.

Under the Bankruptcy Code, the filing of a petition in bankruptcy operates as a stay of, *inter alia*, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor;" "any act to obtain possession of property of the estate or of property from the estate or to exercise control of property of the estate;" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1), (3), and (6).  The Wilsons' leasehold interest in their home constituted property of the estate, protected from termination and repossession by the automatic stay.  *See In re Schewe*, 94 B.R. 938, 942 (Bankr. W.D. Mich. 1990).  Section 362's automatic stay provision is "effective upon the filing of the bankruptcy petition" and is applicable to all individuals and entities, regardless of whether they are listed in the debtor's bankruptcy schedules and regardless of whether they have notice of the debtor's bankruptcy filing.  *See Tipton v. Adkins (In re Tipton)*, 257 B.R. 865, 875 (Bankr. E.D. Tenn. 2000).  Consequently, regardless of Mr. Steadman's knowledge, or lack thereof, of the Wilsons' bankruptcy filing, his actions in causing the detainer summons to be filed, prosecuting the action to judgment, and regaining possession of the rental home by postjudgment eviction violated the automatic stay.  Mr. Steadman also violated the automatic stay each time he went to the Wilsons' home after their bankruptcy filing, as each visit from the evidence presented was designed to further his goal of removing the Wilsons from the rental property.

"A violation of the automatic stay by itself does not automatically warrant an award of monetary damages or the imposition of sanctions."  *See In re Tipton*, 257 B.R. 875 (quoting *In re Lile*, 103 B.R. 830, 836 (Bankr. S.D. Tex. 1989)).  Only if the violation was "willful" does the Bankruptcy Code authorize, in fact mandate, an award of damages.  *See* 28 U.S.C. § 362(k)(1). According to the statutory language, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and in

9

appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1); *See In re Poteat*, 627 Fed. Appx. 475 (6th Cir. 2015) ("having found a willful violation of the stay, the bankruptcy court recognized that Poteat was entitled to an award of her actual damages, including costs and attorneys' fees, and that assessment of punitive damages is allowable 'in appropriate circumstances'"). A violation is willful if "the creditor deliberately carried out the prohibited act with knowledge of the debtor's bankruptcy case." *Walker v. Midland Mortgage Co. (In re Medlin)*, 201 B.R. 188, 194 (Bankr. E.D. Tenn. 2001). As explained by one court:

> A specific intent to violate the stay is not required, or even an awareness by the creditor that her conduct violates the stay. It is sufficient that the creditor knows of the bankruptcy and engages in deliberate conduct that, it so happens, is a violation of the stay. Moreover, where there is actual notice of the bankruptcy it must be presumed that the violation was deliberate or intentional.

> Satisfying these requirements itself creates strict liability. There is nothing more to prove except damages.

*In re Printup*, 264 B.R. 169, 173 (Bankr. E.D. Tenn. 2001) (quoting *In re Daniels*, 206 B.R. 444, 445 (Bankr. E.D. Mich. 1997)). It is also well established that "[g]ood faith is not a defense and is irrelevant to liability." *Id.* Similarly, relying on the advice of another, even that of counsel, is not a defense. *See In re Warren*, 532 B.R. 655, 663 (D.S.C. 2015). Further, the failure to rectify a violation of the stay once notified of the bankruptcy filing is a willful violation of the automatic stay. *See In re Tipton*, 257 B.R. at 874. As stated by one court, "when a creditor receives actual notice of a [bankruptcy filing], the burden is then on the creditor to assure that the automatic stay is not violated, or, if it has been violated prior to receipt of actual notice, the burden is on the creditor to reverse any action taken in violation of the stay." *Mitchell Const. Co. v. Smith (In re Smith)*, 180 B.R. 311, 319 (Bankr. N.D. Ga. 1995).

Based on a careful consideration of all of the evidence, the court finds that Mr. Steadman acted with knowledge of the Wilsons' bankruptcy filing. From the testimony of the Wilsons, it was established that Mr. Steadman was told each time that he came to their house that they had filed for bankruptcy relief. The court found the Wilsons to be credible, and their version of the events is supported by the fact that they were current in their rent at the time, their lease had not yet expired, and Mrs. Wilson was so upset by each encounter that she filed police reports against Mr. Steadman.

It is simply illogical that they would not have told him of their bankruptcy filing each time he came by, as there appeared to be no other reason for his visits other than to harass them into vacating their home.

Further, Mr. Steadman did not specifically deny that the Wilsons told him of their bankruptcy filing. His counsel did ask him at the hearing, "when did you receive notice, your initial notice, of the bankruptcy filing?"  Mr. Steadman responded that he was not advised of it until he came home one evening about six or seven o'clock and his wife informed him that notice had came in the mail.  The way the question and answer were worded suggest that Mr. Steadman was testifying as to when he received official, written notice of the Wilsons' bankruptcy filing, since the letter from Mr. Jordan included the bankruptcy notice from the bankruptcy clerk of court.  And even if Mr. Steadman intended from his testimony that he did not have actual knowledge of the Wilsons' bankruptcy until his wife told him, he was less credible than the Wilsons.

Moreover, even if Mr. Steadman were to be believed, his testimony confirms that he knew of the Wilsons' bankruptcy filing before he evicted them on December 11, 2015.  Robin Smith of Keller Williams testified that Mrs. Steadman telephoned her on December 1 to tell her about the Wilsons' bankruptcy filing, a date Ms. Smith confirmed by her phone records.  Ms. Smith also testified that Mr. Steadman himself telephoned her on December 8 after receiving a second notice regarding the bankruptcy filing.  Consistent with Ms. Smith's testimony, Mr. Steadman testified that after his wife told him about the notice he called Keller Williams to discuss the bankruptcy filing, and that "a couple of weeks later" he met with his attorney about the filing, with his counsel confirming the date of their meeting as December 15.  Two weeks before December 15 would be approximately December 1, when Mrs. Steadman telephoned Ms. Smith, well before the December 11 eviction.

Also, attorney Dave Jordan testified that he talked with Constable Woods by phone that day to advise him of the bankruptcy filing, and it is a logical inference that Mr. Woods would have discussed this with Mr. Steadman who was present, since the eviction was delayed by the Wilsons attempting through Mr. Jordan to get the state court judge to set aside the eviction order.  Mr. Steadman's defense that he acted in good faith at all times, because he was relying on Keller

11

Williams' assertion that they were "fine" with the Wilsons' bankruptcy, indicate that he was aware of the bankruptcy filing.  And even if his claim of reliance were believable, it affords him no safe harbor for the eviction because, as noted, neither good faith nor advice of counsel provides a defense to liability for willful violation of the automatic stay.  The Wilsons, having established that Mr. Steadman willfully violated the automatic stay, are entitled to a mandatory award for actual damages sustained by them.

Considering the Wilsons' claims for damages, the first is reimbursement for housing in the amount of $1,871.92  for 38 nights at Motel 6 from December 11, 2015 through January 28, 2016. Mr. Steadman questioned whether the Wilsons were sufficiently diligent in locating new housing. Mr. Wilson testified that he and his wife contacted numerous companies about various rentals, but kept getting turned down because of their pending chapter 7 case, citing five places that declined their application.  Mrs. Wilson testified that she placed phone calls and looked for alternative housing five or six times a week, as she didn't want her two sons living in a motel at Christmas. The court finds that the requested damages for motel lodging were a direct consequence of Mr. Steadman's stay violations and rejects the assertion that they are unreasonable.   The Wilsons are seeking reimbursement for only 38 nights, even though December 11 through January 28 would be 49 nights, which meant that the Wilsons must have stayed with family or friends during part of this time.  Further, $1,871.92 divided by 38 is $49.26, such that the cost of the Wilsons' motel room was less than $50 per night, which is certainly reasonable.  These numbers also indicate that the Wilsons procured only one motel room, with the entire family of four (family of three when Mr. Wilson was away working), including a 16 year old male teenager and his 10 year old brother, staying in the single room.  Because this living arrangement would have been far from comfortable over any extended period of time, the court finds it doubtful that the Wilsons intentionally dragged their feet so that they could continue living in a motel.  The court found Mrs. Wilson credible when she testified that she did not want her boys living in a motel over Christmas.  It was also to be expected that the Wilsons would have difficulty in finding another rental while their chapter 7 case was pending.

Similarly, the court finds the Wilsons' request for reimbursement of food expenses of $750, based on $30 a day for 25 days, to be reasonable and a direct consequence of Mr. Steadman having

12

removed the Wilsons from their home in violation of the automatic stay. Mr. Wilson testified that the family had to spend at least this amount eating out while they were living in the motel room, with detail for these expenditures provided in their bank statements. Although Mr. Wilson's cross examination revealed that there were a few days in which at least $30 was not charged at restaurants, this revelation was not surprising since the Wilsons only sought reimbursement for 25 days, even though it took them 49 days to find alternative housing. Presumably, the Wilsons were able to eat in their room from groceries purchased the other 24 days, or possibly eat with family and friends during the holidays. Regardless, restaurant expenditures of only $750, when a family of four is living in a single motel room for 49 days, is quite modest. Further, the Wilsons sought no damages for the food in the refrigerator they had to throw away when they were evicted from their home.

No objection was voiced by Mr. Steadman to the $500 that the Wilsons had to pay to Affordable Movers, for its assistance in loading the Wilsons' personal property into the U-Haul and then into storage, nor to the $537.67 that the Wilsons paid for the five-day U-Haul rental. Both sums were damages sustained by the Wilsons as a direct consequence of Mr. Steadman's stay violations, and therefore recoverable as actual damages. Similarly, the Wilsons' actual damages included the $275 cost of replacing their keys taken by Mr. Steadman, which he did not deny.

The Wilsons also seek damages for Mr. Wilson's lost wages for 14 days when he had to miss work due to Mr. Steadman's stay violations and $320 for fuel for two round-trip trips taken by Mr. Wilson from Southhaven, Mississippi to Kingsport, Tennessee to respond to Mr. Steadman's actions. As to fuel costs, Mr. Wilson testified that he returned home on November 2 after Mr. Steadman entered the Wilsons' home and harrassed Mrs. Wilson, since she was quite shaken by the intrusion, and then again in order to attend the November 30 hearing. Because both trips were an appropriate response to Mr. Steadman's willful stay violations, the $320 fuel cost is recoverable as actual damages. Regarding Mr. Wilson's lost wages, he testified that his gross salary is $1,200 per week, plus per diem of $700 per week, and that he missed two days of work for the November 2 trip and two or three days for the November 30 trip, with the remainder of the 14 days for work missed due to the December 11 eviction. Mr. Wilson did not explain why he needed to miss nine or ten days' work after the eviction, although he did testify that their furniture and possessions sat on the U-Haul truck for five days while they attempted to find alternative housing. As with the fuel costs,

Mr. Wilson's lost wages caused by the two November trips, two days each, are recoverable as they were direct consequences of Mr. Steadman's willful stay violations. Similarly, five days of lost wages after the eviction, which would be for one work week, would also be reasonable, for a total of nine days. As to the amount of wages, because Mr. Wilson's base salary was $1,200 a week, presumably for five days per week, $240 per day is the proper measurement, since the per diem was to compensate for expenses working away from home and Mr. Wilson was not away from his family on these days.[2] Consequently, the damage award for lost wages is $2,160.

Also recoverable is $200 for the jewelry box broken by Mr. Steadman when he entered the Wilsons' home on November 23, 2015, and for the two items that the Wilsons were unable to load on their truck, $350 for the computer desk and $400 for the weight bench, since presumably they could only obtain a small truck on such short notice. Mr. Steadman did not deny breaking the jewelry box, and Mr. Wilson testified that $200 was the purchase price of the box. It was pointed out on cross examination that the Wilsons had failed to list the jewelry box and weight bench in their bankruptcy schedules, which failure they attributed as an oversight. While the Wilsons undeniably should have been more accurate in completing their schedules, there was no evidence that the failure to include the items was done intentionally in order to mislead creditors, as the Wilsons had room to exempt the items in their catch-all personal property exemption if the two items had been listed.

As for the $75 sought for the cost of Wilsons' Christmas tree, which they were unable to enjoy because they had to take it down when they were evicted and did not have room for in their motel room, the Wilsons still have the artificial tree such that there was no actual damage resulting

---

[2] On cross examination, Mr. Wilson was questioned why he listed his gross monthly income in Schedule I at $3,600, if he actually made $1,200 per week, which equates to almost $5,000 per month. Moreover, in his summary of damages, Mr. Wilson listed his wages as $428 per day, which Mr. Wilson explained was only an estimate that included his per diem paid to him by his employer. While the overstatement of daily income in the summary and the understatement of monthly income in the schedules are troublesome, as the Wilsons were presenting the information under penalty of perjury, the court finds no intent to mislead from the errors. Mr. Wilson's correct gross income of $1,200 per week was set forth in the six payment advices he filed in his bankruptcy case on October 7, 2015, and the Wilsons' statement of financial affairs sets forth his annual income to date, consistent with the payment advices. Moreover, at the hearing, Mr. Wilson testified consistent with these numbers.

from its disuse.  The Wilsons' claim for damages of $53 for the loss of the beta fish and tank that they had to leave behind because there was no room to keep the fish in the motel, is rejected because Mr. Wilson testified that the fish tank was small, the size of a basketball.  Given its size, the court concludes that the Wilsons could have taken the tank and fish with them, such that judgment for such loss is not appropriate.

Concerning the Wilsons' security deposit of $650, which Mr. Steadman failed to return, the court agrees that it constitutes part of the Wilsons' actual damages from the willful stay violations. It was undisputed that they were current in their rent at the time of the eviction.  Mr. Steadman did testify that the rental house "was in shambles" after the eviction, that the back bedroom had Mountain Dew and flour poured on the floor, that light bulbs had been broken in the fireplace, that clothes had been stuffed in the commode, that there were "big chunks of tomato," which looked as if they had come from a pizza, on the wall of the shower, that there was nicotine on the walls, even though smoking in the house was prohibited, and that the condition of the landscaping on the outside of the house was "horrible."  Mr. Steadman estimated that it cost about $3,000 to clean up the house.

The court did not find Mr. Steadman credible as to these statements.  He offered no proof of the alleged damage, such as pictures of the house or receipts evidencing the cost of clean-up. While certainly there may have been some post-eviction clean-up required due to the hurried manner in which the Wilsons were forced to leave the home, there was no indication that the Wilsons intentionally trashed the house.  Constable Woods, who served the writ of possession on the Wilsons on December 11 and waited while they loaded their property, testified that he could see in the house and that it was "in good shape, neat and tidy, and well-kept."  Mr. Wilson denied any mistreatment of the house, stating that they left the house in good condition and that a lawn mowing service mowed the yard every two weeks, although admitting that a Mountain Dew soft drink could have accidentally spilled.  Mr. Steadman did not seek damages against the debtor in the state court action, nor did he file a response to the motion to contempt to formally claim any offsetting damages.  The lease agreement provides that "[a]t the termination of occupancy, Lessor shall inspect the premises and compile a comprehensive listing of damages to the premises that are the bases for any charge against the security deposit, and the estimated dollar cost of repairing such damages," which listing must then be given to the Lessee.  Mr. Steadman provided no such listing to the Wilsons.  No

15

allegation was made by Mr. Steadman that the house was in shambles when he entered it previously on November 2 and 23. If he is to be believed, the Wilsons trashed the house while they were being evicted and while the constable and Mr. Steadman were waiting outside, an unlikely scenario. Accordingly, the court concludes that the Wilsons are entitled to the return of their $650 security deposit, and that Mr. Steadman has failed to establish any right of offset.

The Wilsons also request that a judgment against Mr. Steadman include utility deposits that they lost when he placed the utilities in his daughter's name. However, the evidence did not sufficiently establish that Mr. Steadman's actions caused the Wilsons to lose these deposits. Their schedules indicated that they owed the city of Kingsport and Johnson City Power Board in Kingsport for unpaid utilities on the date of the filing of the petition. As argued by Mr. Steadman's counsel, it is just as likely that the Wilsons lost their utility deposits because of offsets taken by the utility companies under 11 U.S.C. § 366(c)(4) after the bankruptcy filing. Accordingly, the Wilsons' claim for damages in the amount of $390 for these utility deposits must be rejected.

The awarded sums for actual damages total $8,014.59. In addition to this amount, the Wilsons are entitled under § 362(k)(1) to an award of reasonable attorney fees incurred due to Mr. Steadman's willful stay violations. Upon the conclusion of the April 26, 2016 hearing, the court directed the Wilsons' counsel to file within 10 days affidavits of the fees being requested and Mr. Steadman's counsel was provided with 10 days after that filing in which to object. On May 5, 2016, the Wilsons' counsel filed an application for compensation of $5,833.27, consisting of $1,977.50 in legal fees and $280 in expenses to Mr. Jordan, and $3,500 in legal fees and $75.77 in expenses to Mr. Bieger. The certificate for the application indicates it was served upon both Mr. Steadman and his counsel. The application itself states that any objection should be filed within 10 days. No objection having been filed by Mr. Steadman as to the reasonableness of these fee requests, the Wilsons are awarded recovery of their attorneys' fees and expenses against Mr. Steadman in the amount requested.

IV.

Section 362(k)(1) of the Bankruptcy Code authorizes not only an award of actual damages to a person injured by a willful stay violation, but also punitive damages "in appropriate

16

circumstances." 11 U.S..C. § 362(k)(1).   As interpreted by the various courts, the circumstances appropriate for punitive damages involve conduct that is particularly "egregious, vindictive or intentionally malicious," "when there is a strong showing that the creditor acted in bad faith or otherwise undertook their actions in reckless disregard of the law," or upon finding that the actions were "taken in arrogant defiance of federal law." *Tyson v. Hunt (In re Tyson)*, 450 B.R. 754, 767 (Bankr. W.D. Tenn. 2011) (quoting cases).  The imposition of punitive damages, designed to both punish and deter, is a matter within the discretion of the bankruptcy court. *See In re Timbs*, 178 B.R. 989, 997 (Bankr. E.D. Tenn. 1994).

Applying the standard to the case at hand, the court concludes that punitive damages are appropriate and necessary. First, there was no evidence that Mr. Steadman had a contractual basis to evict the Wilsons.  None was set forth in the detainer warrant, and neither Mr. Steadman nor Ms. Smith testified as to why Mr. Steadman wanted the Wilsons evicted, with Ms. Smith being hesitant to initiate eviction proceedings because the Wilsons were current in their rent.  In describing the required clean up after the eviction, Mr. Steadman did state that the condition outside of the house was "horrible" during the time that the Wilsons lived there, although the only specifics he gave to support this description was that he had to mow the yard with a tractor after the Wilsons were evicted, and there were weeds four feet tall in the flowerbeds.  Mr. Wilson, on the other hand, testified that a lawn service mowed the yard every two weeks.  Given the hyperbolic nature of Mr. Wilson's testimony in general, and the lack of any allegation that the Wilsons were in default under the lease due to improper lawn care or otherwise, the court is unable to find that Mr. Steadman had a legal right to terminate the lease.  Rather, the evidence suggests that Mr. Steadman wanted the Wilsons out of the house so that he could move in his daughter and son-in-law, regardless of whether the Wilsons were in default.  Because of Mr. Steadman's willful disregard of the Wilsons' contractual rights, punitive damages are appropriate.

Second, punitive damages are appropriate in this case because the means Mr. Steadman employed to evict the Wilsons were particularly egregious.  Rather than simply directing his agent to move forward with the eviction proceedings, he personally went to the Wilsons' home on multiple occasions, twice going into the home uninvited when Mrs. Wilson was there without her husband. Each visit resulted in arguments that led to police reports being filed. Mr. Steadman's second entry

17

into the house was particularly outrageous, since he entered the home by breaking the door lock while Mrs. Wilson was inside taking a bath, and then verbally abused her through the bathroom door.  At the hearing, Mr. Steadman did not deny that he engaged in this atrocious behavior.

Third, punitive damages are appropriate because Mr. Steadman continued with his efforts to evict the Wilsons, even in the face of warnings from the Wilsons' attorney that his actions were contrary to law and could subject him to penalties.  Mr. Jordan's November 25 letter, which Mrs. Steadman discussed with Ms. Smith on December 1, advised that "the automatic stay provisions of 11 U.S.C. 362(a)(1) stay all judicial proceedings pending against the Debtor." The Notice from the bankruptcy court clerk, which Mr. Jordan included in his letter, stated, "If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be penalized.  Consult a lawyer to determine your rights in this case."  Similarly, Mr. Jordan's December 1 letter, which Mr. Steadman had received by December 8 according to Ms. Smith's testimony, stated: "you must immediately terminate all of your collection activities and contact with our client, or we will be forced to file a Motion for Contempt in the Bankruptcy Court."  Notwithstanding these warnings, Mr. Steadman proceeded to obtain a writ of possession on December 11 to forcibly remove the Wilsons from their home.  And, despite suggestions from Ms. Smith on two occasions that he consult an attorney, Mr. Steadman waited until December 15, after the eviction and almost a month and a half after first being told by the Wilsons that they had filed for bankruptcy relief, before consulting an attorney.  Despite the previously addressed assertion that Mr. Steadman was relying on the opinion of Keller Williams' attorney in moving forward with the eviction, Mr. Steadman had sufficient contrary information from Mr. Jordan that should have raised a red flag and caused him to stop the eviction until he received clarification from this own attorney.  Proceeding either intentionally or recklessly in violation of the Wilsons' federally protected rights under the Bankruptcy Code, after receiving the letters from Mr. Jordan, justify punitive damages.

Lastly, Mr. Steadman's actions were particularly egregious because of their timing.  He evicted the Wilsons on December 11, less than two weeks before Christmas, after the Wilsons already had their tree up in preparation for Christmas, and on the same day of their older son's 16th birthday party planned that evening at the Wilsons' home.  The party had to be quickly moved to a restaurant and the Wilsons and their family ending up living in a single motel room during the

18

holidays.

The foregoing demonstrates that Mr. Steadman did not act in good faith as he claimed, but to the contrary in bad faith. His counsel argued that the court should consider in assessing damages Mr. Steadman's good faith efforts to remedy the harm done to the Wilsons. However, all Mr. Steadman did was agree to set aside the state court default entered in the detainer action and he stored the Wilsons' desk and weight bench that they had left on the premises. At no time did he offer to allow the Wilsons to return to the premises, even after he consulted an attorney on December 15, at a time when their personal property was still on the U-Haul truck and they could have returned to their home with little additional expense. Moreover, it was clear from Mr. Steadman's attitude at the hearing that he did not regret his actions, although he did say that he was sorry for their children's sake. From his seat at counsel table, Mr. Steadman often smirked at the Wilsons, clearly contemptuous of them and damages they had sustained. It was for creditors like Mr. Steadman that § 362(k)(1) and its authorization of punitive damages was enacted by Congress. Overwhelmingly, this is an "appropriate circumstance," within the language of the statute. As a final note on the award, the court recognizes that an award of punitive damages is reserved for the exceptional case and observes that this is only the second time in more than 22 years that this jurist has granted such an award in connection with a willful violation of the automatic stay.

As to the appropriate amount of punitive damages, the award should be "gauged by the gravity of the offense and set at a level sufficient to insure that it will punish and deter." *In re Mercer*, 48 B.R. 562, 565 (Bankr. D. Minn. 1985). Stated differently, the award must be sufficient to "sting the pocketbook of the wrongdoer." *Id*. at 566. Without evidence that Mr. Steadman has particularly deep pockets, the court cannot find that the $40,000 punitive damages requested by the Wilsons is appropriate. Mr. Steadman testified that the property formerly rented to the Wilsons, which now houses his family, is his only rental property. Considering the fact that this rental property itself provided Mr. Steadman a gross income of $7,800 per year while leased to the Wilsons, the court concludes that an award of $5,000 for punitive damages is appropriate. *Cf. In re Mercer*, 48 B.R. at 566 ($5,000 awarded as punitive damages when defendant broke down debtor's door when only minor children were home and repossessed a stereo).

In summary, the court will grant the Wilsons' motion against Mr. Steadman and, pursuant to 11 U.S.C. § 362(k)(1), award the Wilsons actual damages of $8,014.59, costs and attorneys' fees of $5,833.27, and punitive damages of $5,000, because of Mr. Steadman's willful violations of the automatic stay provisions of the Bankruptcy Code.  An order will be entered in accordance with this memorandum opinion.

# # #